UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

LOLA BURKE, Individually and as        ]
Executrix of the Estate of             ]
WILLIAM C. BURKE,                      ]
                                       ]
        Plaintiff,                     ]
                                       ]
    vs.                                ]   CV-04-CO-00438-W
                                       ]
GENERAL MOTORS CORPORATION,            ]
                                       ]
    Defendant.                         ]

MEMORANDUM OF OPINION

I.      Introduction.

        Currently before the Court are two motions in limine filed by the

defendant, General Motors Corporation ("GM"), to exclude the testimony of

two of Plaintiff's experts, Brian Frist and Donald Phillips, and a motion for

summary judgment filed by GM on June 1, 2005.  (Docs. 31, 34, & 36.)  The

plaintiff, Lola Burke, has filed suit against GM for liability under the

Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"), negligence,

wantonness, breach of express or implied warranty, and wrongful death

under Ala. Code § 6-5-410.  (Docs. 1, 15.)   GM has moved for summary

judgment on each of Plaintiff's claims.  (Docs. 33, 49.)  The Court heard arguments by both parties regarding the motions in limine on July 14, 2005, and the issue is ripe for decision.  Upon full consideration, Defendant's motions in limine, as well as its motion for summary judgment are due to be granted.

II.    Background.[1]

On February 2, 2004, William and Lola Burke were driving their 2002 GMC Sierra pickup through the intersection of I-459 and I-59 South outside of Birmingham, Alabama.  To avoid hitting another vehicle, Mr. Burke swerved to the side of the road, and the truck came to a stop when it struck a tree.  The Burkes originally brought suit for the injuries they incurred as a result of the accident, but following Mr. Burke's death, the complaint was amended to add a claim for wrongful death.  Both Mr. and Mrs. Burke were restrained by the truck's seat belt system, but the truck's single-stage airbags did not deploy.  Plaintiff claims that the 2002 GMC Sierra was

---

[1]The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, the parties' Joint Status Report, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party for the purposes of deciding the defendant's motion for summary judgment. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

defective and unreasonably dangerous because the airbag failed to properly deploy under conditions in which it should have deployed.

In support of her theory of design defect, Plaintiff has presented the testimony of two experts, Brian Frist, M.D., and Donald Phillips, who have testified that Mr. Burke's post-accident injuries were caused by a defect in the design of the Sierra's safety equipment and not by Mr. Burke's preexisting condition.  Mr. Burke suffered from ankylosing spondylitis ("AS"), a disease which causes the ligaments and soft tissue of the spine to harden and calcify.  Dr. Frist has testified that the accident and not the AS was the cause of Mr. Burke's injuries.  Mr. Phillips' testimony addressed the specific design defects that caused the Burkes' injuries, and he claimed that if the 2002 Sierra had been equipped with the airbag system that was installed in 2003 model Sierras, the Burkes' injuries could have been avoided.

III.   Motions In Limine.

   A.   *Daubert* Analysis.

While Federal Rules of Evidence 401 and 402 provide for the liberal admission of relevant evidence, Rules 403, 702, and 703 mitigate against this

general policy by giving trial courts the discretion to exclude expert testimony that is either unreliable or irrelevant.  *See Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999).  The Eleventh Circuit has held that scientific expert testimony is admissible when: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.  *See, e.g., Toole v. Baxter Healthcare Corp.*, 233 F.3d 1307, 1312 (11th Cir. 2000); *Allison*, 184 F.3d at 1309; *City of Tuscaloosa v. Harcross Chem., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998).

In *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), the Supreme Court imposed a special duty upon trial judges pursuant to Rule 702, requiring the judge to act as a "gate-keeper" and ensure that scientific evidence is both reliable and relevant before it is admitted.  *Id*.  The Supreme Court has recognized that judges are not trained scientists and that

the task imposed by *Daubert* is difficult in light of their comparative lack of expertise.   *General Electric Co. v. Joiner*, 522 U.S. 136, 148 (1997). Nevertheless, the judge's relatively inexpert attention is considered preferable to dumping a "barrage of questionable scientific evidence on a jury." *Allison*, 184 F.3d at 1310.  When the expert evidence is complex and voluminous, a trial court has inherent authority to use neutral outside experts of its own choosing to help with the *Daubert* undertaking.  *Id.* at 1310-11.   While this Court is aware of its duty as a gatekeeper, it understands that its role is not intended to supplant the adversary system or the role of the jury, and it recognizes that "[v]igorous cross- examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Daubert*, 509 U.S. at 596).

The *Daubert* Court set out four nonexclusive factors which should be considered by a trial court assessing the reliability of expert scientific testimony under Rule 702: (1) whether the theory or technique is capable of being tested; (2) whether the theory or technique has been subjected to peer review; (3) whether the technique has a high known or potential rate

of error; and (4) whether the theory has gained general acceptance within the scientific community.  *Daubert*, 509 U.S. at 595.  Other factors which have been considered in conducting a *Daubert* analysis include reliance on anecdotal evidence (as in case reports), temporal proximity, and extrapolation (as in animal studies). *Allison*, 184 F.3d at 1312.

A *Daubert* inquiry focuses on the principles and methodology underlying expert opinion testimony, not on the conclusions they generate. *Allison*, 184 F.3d at 1312 (citing *Daubert*, 509 U. S. at 595). However, testimony based solely on the experience of the expert is not admissible. *Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999)).  The court must be sure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id*.  Accordingly, the proponent of the testimony does not have the burden of proving that the testimony is scientifically correct, but that it is reliable.  *Allison*, 184 F.3d at 1312.  The focus in a *Daubert* analysis is on the "principles and methodology, not on the conclusions" the experts generate.  *Daubert,* 509 U.S. at 595.  However, the conclusions reached and

the methodology used to reach them are not "entirely distinct from one another." *Joiner*, 522 U.S. at 146.  Often, experts will extrapolate from already existing data.  *Id*.  "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*.  This scientifically valid connection between the opinion and the facts also has been called "analytical fit."  Rider, 295 F.3d at 1197.

*Daubert* also requires a special inquiry into relevance, calling on the court to ensure that the expert testimony logically advances a material aspect of the proposing party's case. *Allison*, 184 F.3d at 1312 (citing *Daubert*, 509 U.S. at 591). There must be a valid scientific connection between the testimony and the disputed facts in the case, and "scientific validity for one purpose is not necessarily scientific validity for other unrelated purposes."  *Id*.  Furthermore, when expert opinion is based on otherwise inadmissible hearsay, *Daubert* establishes that Rule 703 requires the trial court to ensure that the underlying facts or data upon which the

expert bases his opinion or inference are of the type reasonably relied upon by experts in the particular field. *Allison*, 184 F.3d at 1312. In the Eleventh Circuit, Rule 702 is said to govern only the scientist's "major premise" (the "principal, procedure, or explanatory theory derived by inductive, scientific technique") while Rule 703 addresses "the sources the expert may consult in collecting the case specific information to serve as the minor premise." *Allison*, 184 F.3d at 1313.

The plaintiff in this case has presented the testimony of two different experts and the Court has received sufficient information and explanation from both parties to allow it to determine whether the testimony is admissible under the *Daubert* framework.

B.     Brian Frist, M.D.

Plaintiff has presented the testimony of Dr. Frist for the purposes of showing that "Mr. Burke's AS, in conjunction with the failure of the airbag to deploy and the seat belt to keep him restrained, combined to cause his injuries." (Doc. 52, p. 2.) GM has argued that Dr. Frist's testimony should be excluded because he did not follow reliable methodology when he reached his conclusion. (Doc. 51.) To determine that the accident was the

cause of Mr. Burke's injuries, Dr. Frist applied his own experience as a medical examiner, looked at the vehicle involved in the accident, studied the radiology reports documenting the condition of Mr. Burke's spine, and applied the Abbreviated Injury Scale of 1990 ("AIS") to this accident.  (Doc. 52, p. 20.)

Dr. Frist is the Chief Medical Examiner for Cobb County, Georgia, where he is responsible for determining the cause and manner of death of individuals.  In order to determine the extent of Mr. Burke's disability due to AS before the accident, Dr. Frist examined the post-accident radiology reports.  Based upon those reports, he is of the opinion that Mr. Burke experienced changes to his spine due to AS prior to the accident, including irregular bone growth, prominent degenerative changes and inflammation throughout the spine, and extensive discogenic and facet degenerative changes throughout the entire cervical spine.  (Frist Depo. at 32, 44, & 64.) Despite his AS-related symptoms, Dr. Frist holds the opinion that Mr. Burke was still able to work, was not immobile, was able to engage in various activities, and was not in significant pain prior to the accident.  (Frist Depo. at 24-25.)   This opinion is based on the radiology reports, as well as

information regarding the impact of AS on Mr. Burke supplied by Plaintiff's counsel and Mr. Burke's wife.

In addition to determining the effects of AS on Mr. Burke prior to the accident, Dr. Frist also formed an opinion regarding the effects of AS on Mr. Burke's post-accident injuries.  He referred to the AIS article for his data supporting the proposition that Mr. Burke would have sustained the same or similar injuries whether he experienced AS-related problems prior to the accident or not.  According to Dr. Frist, that study shows that when we look at members of the public-at-large age seventy-five years or older, and subject them to a frontal crash at 19-24 m.p.h., 37-50% of the individuals will suffer AIS level 3 injuries just like Mr. Burke.  The data includes victims of all crashes, including those with or without AS as a preexisting condition. The article concludes that "by comparing the relevant restraint coefficients as a function of casualty severity, it appears the superiority of 'belt & airbag' v. 'belt only' is dominant at high casualty severities, e.g. fatalities and MAIS 3+, but declines at lower severities, e.g. MAIS 2+."  (AIS Article, p. 182.)  Because members of the general public subjected to a crash similar to Mr. Burke's would have a 37-50% chance of suffering the same or similar

injuries, coupled with Dr. Frist's examination of Mr. Burke's radiology reports, Dr. Frist has concluded that the accident and not AS was the cause of Mr. Burke's injuries and eventual death.

He also takes it one step further by concluding that the injuries could have been avoided if the airbag in Mr. Burke's truck had deployed during the accident.  Dr. Frist testified at his deposition that he believes that the seat belt acted as a fulcrum causing Mr. Burke's neck to flex over the seat belt and cause a fracture.  (Frist Depo. at 157-58.)  He went on to say that according to the AIS chart, an individual over age seventy-five can experience an AIS level 3 injury from this type of accident.  *Id*.  Because he believes that the data tells him that injuries similar to Mr. Burke's can be the result of a crash at 19-24 m.p.h., Dr. Frist believes that he can support his conclusion that Mr. Burke's injuries were caused by the crash and not by AS.  *Id*.

GM attacks the reliability of the AIS article by arguing that Dr. Frist cannot say how many people in the general population suffer from AS, how many of the occupants represented by the data are occupants who have AS, how many of the data points represent occupants who were in accidents

that are dynamically similar to Mr. Burke's accident, and how many of the data points represent occupants who sustained injury in a manner similar to Mr. Burke.  (Doc. 51.)

The Court must begin by examining the methodology Dr. Frist employed to reach his conclusions that Mr. Burke would have received his injuries even if he did not suffer from AS and that the proximate cause of the injuries was a defect in the truck's restraint system.  Plaintiff does not have to prove that Dr. Frist's conclusions are scientifically correct, but she does have the burden of proving that the testimony and his methodology are reliable.  *See, e.g., Allison*, 184 F.3d at 1312.  Dr. Frist is a medical doctor who relied on data found in the AIS article and his own observations of Mr. Burke's radiology reports to conclude that Mr. Burke's AS did not cause his injuries.   Dr. Frist does not apply any scientific method to reach his conclusions other than referring to the fact that 37-50% of the population with characteristics similar to Mr. Burke would suffer these injuries in a similar accident.  Plaintiff's counsel has stated on the record that Dr. Frist "did nothing but see that the study showed that A.I.S. level three injuries were 37 to 50 percent or more in that Delta V range for the general

population." (Transcript from Hearing conducted on July 14, 2005, pp. 52-53.)

Dr. Frist also extrapolated that if Mr. Burke had been held upright and steady his neck would not have flexed over the seat belt and the injuries would have been avoided. (*See* Frist Depo. at 100.) He testified at his deposition that he believes that if an airbag would have deployed, Mr. Burke's injuries and eventual death could have been averted. *Id*. at 100-04. However, Dr. Frist has not shown, through scientific evidence and analysis, that the forces present with a deployed airbag would have held Mr. Burke upright so as to avoid the injuries that he sustained and further has not demonstrated through any analysis of the forces in that accident that the injuries would not have occurred even if the airbag had deployed. He concludes that if Mr. Burke had been held upright he would not have been injured, but Dr. Frist does so without any effort to analyze the actual forces that would have been inflicted upon Mr. Burke if the airbags had actually deployed. In other words, Dr. Frist has failed to establish that an airbag would have made a difference in this accident. Also, he cannot identify the percentage of the population that does not suffer these kinds of injuries

when an airbag deploys within this Delta V range.  Without quantifying the chances of receiving injuries similar to Mr. Burke's with an airbag deployment, a factfinder would not be able to determine whether the 2003 dual-stage airbag system would have prevented Mr. Burke's injuries.

Reliance upon the AIS to reach conclusions regarding the severity or cause of injuries is not misguided.  *See, e.g., Quintana-Ruiz v. Hyundai Motor Corp.*, 303 F.3d 62 (1st Cir. 2002) (referring to the AIS injury scale when holding that the fact that twenty percent of the population would suffer injuries at a Delta V of fifteen or below was significant); *Klein v. Hollings*, 992 F.2d 1285 (3rd Cir. 1993) (finding that the admission of an expert's opinion based on the AIS did not justify a new trial).  While the fact that 37-50% of the general population may suffer the kinds of injuries incurred by Mr. Burke shows that even people without AS could have been injured in the accident, it does not make it more likely than not that Mr. Burke's injuries were caused by the failure of the airbag to deploy.  Dr. Frist could not say whether the study includes only healthy individuals or if it includes individuals who suffer from AS.   (Frist Depo. at 160-162.) Therefore, he could not provide a statistic for how many people with AS

would have suffered similar injuries in the Burke's accident.  Also, the study does not address the question of whether airbag deployment decreases the likelihood that an individual will suffer injuries similar to Mr. Burke's.  At best, these statistics lead to the conclusion that Mr. Burke had a 50/50 chance of receiving his injuries from this accident, and they do not help the trier of fact reach the conclusion that it is more likely that the 2003 airbag design would have prevented the injuries than GM's position that the injuries were a result of Mr. Burke's preexisting condition.

For these reasons, it is the opinion of the Court that even though Dr. Frist is qualified to testify competently regarding the matters in this case, his methodology was not sufficiently reliable under the *Daubert* analysis, and his testimony would not assist the trier of fact to understand the evidence or determine a fact in issue.  *See City of Tuscaloosa,* 158 F.3d 548. Therefore, Defendant's motion in limine to exclude the testimony of Dr. Brian Frist is due to be granted.

C.     Donald Phillips.

Plaintiff has offered the testimony of Mr. Phillips in an effort to show that the single-stage airbag system in the 2002 Sierra was defective because

it did not deploy during the Burkes' accident.  He proposes an alternative design that employs the system installed in 2003 model Sierras, which has an additional forward sensor and was designed to accommodate a dual-stage airbag system.  To reach his conclusion, Phillips compared the deceleration data from the computer in the Burkes' truck with the data from a 40 k.p.h. offset deformable barrier ("ODB") crash test, involving a similar vehicle in which the airbags deployed.  Because the two data sets did not fit perfectly with one another, Phillips deleted the first 40 milliseconds of the recorded deceleration data from Mr. Burke's accident.  Once that data is deleted, he contends that the two data sets are comparable and that the 2003 system would have deployed in Mr. Burke's accident.

As with Dr. Frist's testimony above, the Court must examine Mr. Phillips' qualifications as an expert, as well as the reliability and relevance of his testimony regarding an alternative design.  Even though the Second Circuit does not seem to be impressed by his credentials, Mr. Phillips appears to have experience in the design of airbag systems and the reconstruction of accidents, both as a professional engineer and as an expert in preparation for litigation.  *See Zaremba v. General Motors Corporation,*

360 F.3d 355, 360 (2nd Cir. 2004) (finding that due to "Phillips's meager qualifications to offer the opinions as to automobile design that these plaintiffs rely on, the District Court's *Daubert* analysis seems almost superfluous."). Therefore, the majority of the Court's analysis will focus on the reliability and relevance of his testimony.

Phillips relied on GM's test reports to determine that the airbag system in 2003 Sierras would deploy in a 40 k.p.h. ODB crash test. There were no similar tests for 2002 models which Mr. Phillips could use to compare with the 2003 system. In order to make the data from the Burke crash match the data from GM's tests, Phillips deleted 40 milliseconds of data from the Burke crash. GM contends that Phillips deletes the 40 milliseconds because he does not know the "all-fire" threshold for the 2003 system, the "no-fire" threshold for the 2003 system, the calibration of the forward sensor in the 2002 system, the calibration of either forward sensor in the 2003 system, or that the 2003 system would have ignored the first 40 milliseconds of data from the Burke's crash - as Phillips himself does. (Doc. 50, p. 6.) Even though he stated that most of this information is contained in the "Final Report to the Performance Assessment Committee" of GM, Phillips never

attempted to confirm the existence of these documents.  (Phillips Depo. at 57-59.)  By simply deleting 40 milliseconds of data in an attempt to make the data from the crashes of two different vehicles with two different airbag systems appear to be similar, Mr. Phillips proposes that the 2003 system would have deployed in the Burke crash.

Plaintiff argues that even though the Burke crash and the ODB crash tests were different, the overall effect of the two events was the same. Phillips testified that the "offset tree hit in the Burke case . . . obviously had some compliance to it," and the ODB crash test produces kinematics that are similar to what the Burkes' vehicle experienced during its impact with the tree.  (Phillips Depo. at 64-65.)  To explain his deletion of 40 milliseconds of data, Phillips simply responded that "[t]here is not a lot going on in the first 40 milliseconds."  *Id*. at 107.  He claimed that if the airbag system was working as intended it would have "ignored the lead-in part, and then started truly analyzing the event at the time that it really needed to look at it."  *Id*.  To explain his methodology, Mr. Phillips stated that "in airbag evaluations, it's common for engineers to do phase shifting

to change the timing of events, whether it be through modeling or through actual testing . . . ." *Id.* at 123.

In this particular case, the feasibility of the alternative design proposed by Phillips does not appear to be in dispute. After all, he is simply proposing that the system GM employed in 2003 should have been installed in the 2002 models as well. Plaintiff contends that the only question in this case is whether the 2003 system would have deployed in the crash had it been installed in the Burkes' 2002 Sierra, and Mr. Phillips postulates that it would.

It appears that Phillips' conclusions are capable of being tested, since it would presumably be possible to equip a 2002 GMC Sierra with the 2003 airbag system and subject it to a crash involving the same forces that were recorded by the computer in the Burkes' truck. It is not clear whether Phillips' theory has been subjected to peer review or whether it is generally accepted in the scientific community because the only evidence provided to the Court is his own testimony that engineers commonly change the timing of events when evaluating airbag deployments. (Phillips Depo. at 123.)

The Court is concerned that Phillips' deletion of data in an effort to compare the 2002 and 2003 systems defeats the very purpose of his testimony.  By moving the line that begins the computer's analysis of the event in question, not only have you deleted some of the data but you have also altered the change in velocity ("Delta V") at that point.  Once you ignore the first 40 milliseconds you have also slowed the vehicle to a velocity that is necessarily less than that with which you began.  You cannot move the starting point and ignore the resulting deceleration.  It is worth noting that in his deposition, Phillips testified that "the 2003 system uses past data and uses that to change the baseline and then can advance or delay deployment based on the change in conditions that are occurring throughout the crash event." (Phillips Depo. at 127.)  He later testified that if the curve is "phase shifted" by moving it 40 milliseconds, "the velocity boundary curve would have been crossed," but he does not provide any scientific basis for the shift.  *Id*. at 133.  At the *Daubert* hearing, Plaintiff's lawyer stated that the reason for the shift was that Phillips determined that the first 40-50 milliseconds of data from the Burke's truck was not from the impact with the tree because the deceleration and Delta V was not

substantial enough to indicate an impact with a tree.  (Tr. from Hearing at 112.)

However, if we "phase shift" the curve, how do we know that the deceleration rate will be the same for the Burke's crash as it was in the crash tests performed by GM?  Phillips testified at his deposition that the recorded deceleration velocity at the time of airbag deployment for the 2003 Sierras subjected to the 40 k.p.h. O.D.B. crash test was 15 m.p.h. (Phillips Depo. at 102-03 & 124-25.)  He then compared that data with the Burkes' accident, where the truck reached a change in velocity of 15.36 m.p.h. at 150 milliseconds, but Phillips failed to include in his analysis that he deleted the first 40 milliseconds.[2]  *Id.* at 85.  During that time, the truck lost 1.32 m.p.h., and the change in velocity at 50 milliseconds was 1.76 m.p.h.  (Tr. from Hearing at 109-10.)  Therefore, the Burke's truck never

---

[2]Phillips has also failed to explain why the Burke's truck, if equipped with the 2003 system, would have ignored the first 40 milliseconds of data.  In order to fully understand when the airbags in the 2003 system would have deployed, it would be necessary for Phillips to examine all of the factors employed by the 2003 system's computer to determine when to activate the airbags.  Presumably, those factors are considered by the computer's software during the crash event.  While Phillips explained the factors that the 2002 system uses to determine when to deploy the airbags, he does not appear to have reviewed the 2003 program, and he cannot say what factors would have been required to set off the airbag in the Burkes' crash.  (Phillips Depo. at 96-97.)

would have reached the 15 m.p.h. change in velocity that was necessary for the airbags to deploy in the 2003 system because the vehicle had already slowed to a velocity of 14.04 m.p.h. at the point where Mr. Phillips starts analyzing the data.  If Phillips noticed this discrepancy, neither he nor Ms. Burke's lawyer explained any rationale to account for it.  It is elemental that Mr. Phillips must be able to scientifically demonstrate that the change in velocity in the Burke crash would have been sufficient to cause the airbags in the 2003 system to deploy.  He simply failed at this task.

Mr. Phillips's hypotheses have not been tested, even though they appear to be capable of real world examination.  The methodology itself is also in question.  It does not appear to the Court that Phillips' testimony assists the trier of fact in reaching the conclusion that the 2003 dual stage airbag would have deployed in this case and would have prevented Mr. Burke's injuries from occurring.  For these reasons, Defendant's motion in limine to exclude the testimony of Donald Phillips is due to be granted.

IV.   Summary Judgment.

GM, in addition to filing the two motions in limine discussed above, filed a motion for summary judgment on each of Plaintiff's claims for relief.

(Docs. 33 & 49.)  Defendant contends that Ms. Burke has failed to provide reliable evidence of causation, a necessary element for each of her claims. (Doc. 49, p. 4.)  In fact, Plaintiff's attorney, Mr. Fawal, agreed with the Court during the *Daubert* hearing that if GM's motions in limine are granted and the testimony of Dr. Frist and Mr. Phillips is not admissible then Plaintiff's case cannot survive summary judgment.  (*See* Tr. from Hearing at 179-80.)  Because the Court is of the opinion that Defendant's motions in limine are due to be granted, the Court also finds that Defendant's motion for summary judgment should also be granted.

A.    Summary Judgment Standard of Review.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322−23.  In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party.  *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

B.     Discussion.

Causation is an essential element for each of Plaintiff's theories of recovery.  The AEMLD requires a plaintiff to show the existence of a defect and proximate *cause*.  *See, e.g., General Motors Corp. v. Edwards*, 482 So. 2d 1176, 1191 (Ala. 1985), overruled on other grounds, *Schwartz v. Volvo North America Corp.*, 554 So. 2d 927 (Ala. 1989).  In order to prove a claim for negligence, a plaintiff must establish that the defendant breached a duty owed to the plaintiff and that the breach proximately *caused* injury to the plaintiff.  *Wal-Mart Stores, Inc. v. Rolin*, 813 So. 2d 861, 863 (Ala. 2001).  A claim for recovery under the theory of wantonness requires a showing that the defendant was aware that its conduct would probably *result* in injury to another or in damage to another's property.  *Weatherly v. Hunter*, 510 So. 2d 151, 152 (Ala. 1987).  A party alleging a breach of an implied warranty must show the existence of the warranty, a breach of that warranty, and damages proximately *resulting* therefrom.  *Barrington Corporation v. Patrick Lumber Company, Inc.*, 447 So. 2d 785, 787 (Ala. 1984).  A plaintiff bringing an action under an express warranty must prove that "'the warranty failed of its essential purpose'; [and] that either the dealer refused to repair

or replace the malfunctioning component, or failed to do so 'within a reasonable time.'" *Feil v. Wittern Group, Inc.,* 784 So. 2d 302, 310 (Ala. Civ. App. 2000). Finally, a plaintiff in a wrongful death action under Ala. Code § 6-5-410 is required to show that the wrongful act, omission, or negligence of the defendant *caused* the death of the decedent and that the decedent could have brought an action for the wrongful conduct if it had not resulted in his or her death. Ala. Code § 6-5-410.

The question of proximate cause is typically one for the jury to decide. *See, e.g., Davison v. Mobile Infirmary,* 456 So. 2d 14, 24 (Ala. 1984). However, proximate cause may become a legal issue where "there is a total lack of evidence from which the factfinder may reasonably infer a direct causal relation between the culpable conduct and the resulting injury." *Wassman v. Mobile County Communications Dist.,* 665 So. 2d 941, 943 (Ala. 1995) (quoting *Davison,* 456 So. 2d at 24).

Defendant argues that Plaintiff has failed to come forward with evidence that any alternative design used by GM would have altered the injuries sustained by Ms. Burke. They point to the deposition testimony of Plaintiff's own expert, Dr. Frist, in which he stated that Plaintiff's proposed

alternative designs would not have altered the severity of the injuries sustained by Ms. Burke.  (Doc. 49, p. 4; Frist Depo. at p. 129.)  Dr. Frist testified that in his opinion the magnitude of Ms. Burke's injuries with the 2003 airbag system "would have been very similar" to the magnitude of her injuries in the actual accident.  *Id*.  Therefore, Defendant contends that "[a]ll of plaintiff's [sic] claims relating to Lola Burke . . . fail because plaintiff's [sic] own expert agrees there is no evidence of causation." (Doc. 49, p. 4.)  Ms. Burke's claims also fail because, as explained more fully below, she has not proffered evidence which shows that her proposed alternative design would have deployed in this accident.

As for the claims with regard to Mr. Burke, GM argues that Plaintiff has no reliable evidence that any alleged defects in the restraint system were the cause of his injuries.  (Doc. 49, p. 4.)  Defendant highlights the testimony of Plaintiff's expert, Dr. Frist, who stated that Mr. Burke was not an average eighty year old man at the time of the accident because he suffered from AS.  (Doc. 49, p. 5; Frist Depo. at 21.)  Dr. Frist also agreed with GM's counsel that AS can make the spine more brittle and susceptible to fracture.  (Frist Depo. at 22.)  Of course, Dr. Frist's final conclusion is

that the accident and not AS caused Mr. Burke's injuries.  However, the

Court has found that Dr. Frist's testimony is inadmissable in this case, and

GM correctly notes that without proper evidence that AS was not the cause

of Mr. Burke's injuries, all of Plaintiff's claims on behalf of Mr. Burke fail.

(Doc. 49, p. 5.)

GM also notes that Plaintiff must produce evidence that their

alternative dual-stage airbag deign would have made a difference in this

accident - "specifically, that their alternative air bag system would have

deployed in this accident."  *Id*.  However, without the testimony of Mr.

Phillips, Plaintiff will be unable to produce such evidence.[3]  Therefore, Ms.

Burke has no reliable evidence that the proposed alternative design would

have deployed in their accident.

Because the Court has found that the testimony of Plaintiff's experts,

Dr. Frist and Mr. Phillips, is inadmissible in this case, Plaintiff is unable to

---

[3]Even if the Court found that Mr. Phillips' testimony is admissible, Plaintiff still has not created a genuine issue of material fact as to causation.  As explained in detail is the preceding section, Phillips cannot show through scientific evidence that the change in velocity experienced by the Burke's truck would have been sufficient for the airbags to deploy in a vehicle equipped with the 2003 system.  Without establishing that the 2003 dual-stage airbags would have deployed, Plaintiff cannot prove that the 2002 design was the cause of the Burkes' injuries.

show that the accident was the cause of Mr. and Ms. Burke's injuries and that their proposed alternative design would have deployed in their accident.  To survive summary judgment, a plaintiff must come forward with evidence that the proposed alternative design would alter the injuries sustained in the accident.  *See, e.g., Connally v. Sears Roebuck & Co.,* 86 F. Supp. 2d 1133, 1139 (S.D. Ala. 1999) ("state of the art without proof of utility (and probability of reducing or eliminating the injury) is meaningless"); *Brest v. Chrysler Corp.*, 939 F. Supp. 843, 847 (M.D. Ala. 1996) (granting summary judgment where the evidence "at best allows an inference that . . . the alternative would provide some level of enhanced safety to the occupants," and there is an absence of evidence showing "a potential elimination or reduction in the Plaintiff's injuries from an alternative design"); *Flemister v. General Motors Corp.*, 723 So. 2d 25, 28 (Ala. 1998) (affirming verdict in favor of automobile manufacturer in AEMLD case and concluding that the jury could have inferred that the proposed alternative design would have made no difference given the nature of the impact, despite contrary evidence); *Yarbrough v. Sears Roebuck & Co.*, 628 So. 2d 478, 482 (Ala. 1993) (affirming summary judgment on AEMLD claim

because the record was "devoid of any proof of the existence of a feasible, available alternative" since no explanation was provided that a "simple design modification" would have reduced or prevented injuries or that the utility of the alternative design outweighed the utility of the design that was actually employed). Therefore, no genuine issues of material fact remain and GM's motion for summary judgment is due to be granted.

V.     Conclusion.

For the reasons stated above, the Court holds that the opinions of Dr. Frist and Mr. Phillips are inadmissible and the motions in limine to exclude their testimony are due to be granted. Assuming that the Court is incorrect and Dr. Frist's testimony should be admissible, it is based upon the admissibility of Mr. Phillips' testimony because the airbag would have to deploy to make a difference. Furthermore, Defendant's motion for summary judgment is due to be granted.

Done this 31st day of January 2006.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
124153